## **UNSWORN DECLARATION UNDER PENALTY OF PERJURY**

I, Matthew Ferguson, declare under the penalty of perjury the following is true and correct:

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request search and seizure warrants. I have been employed as a Special Agent with the FBI since September 2009. Prior to my employment with the FBI, I was employed as a Police Officer and Narcotics Officer by the City of North Little Rock, Arkansas Police Department from 2004 to 2009. I am currently assigned to the FBI Little Rock Division, Fort Smith Resident Agency, where I am tasked with conducting criminal enterprise investigations. During my career as a Special Agent, I have been involved in a wide variety of investigative matters, including, relevant to this matter, investigations of violations of 18 United States Code § 1343 (Wire Fraud) and 18 U.S.C. §§ 1956 and 1957 (Money Laundering). During the course of these investigations, I have authored and reviewed multiple Title III wire intercept affidavits, coordinated the execution of search and arrest warrants, conducted physical surveillance, participated in debriefs with confidential sources, analyzed records relating to fraudulent schemes, and communicated with other local and federal law enforcement officers regarding the manner in which individuals involved in major fraud schemes conduct their criminal activities and attempt to hide their ill-gotten gains through various methods of money laundering.

2. This case is being investigated by the Federal Bureau of Investigation ("FBI"), the U.S. Department of Health and Human Services Office of Inspector General (HHS-OIG) and Internal Revenue Service-Criminal Investigation ("IRS-CI").

3. I am familiar with the facts and circumstances described herein. This affidavit is based upon my personal involvement in this investigation, my training and experience, and

information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly. This affidavit does not set forth my complete knowledge or understanding of the facts related to this investigation. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only. All figures, times, and calculations set forth herein are approximate.

4. This affidavit is in support of the civil forfeiture of property that is proceeds of the following Subject Offenses:

    a. Health Care Fraud, 18 U.S.C. § 1347;

    b. Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349;

    c. Money Laundering, 18 U.S.C. § 1957.

5. The violations of Title 18 U.S.C. § 1347 (Health Care Fraud) and 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud) constitute a specified unlawful activity for the purposes of violations of Title 18 § U.S.C. 1957 (Money Laundering), which results in traceable property becoming forfeitable under 18 U.S.C. § 981 (a)(l)(C). That statute states, in relevant part, that any property, real or personal, is forfeitable which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

6. I, the undersigned, make this unsworn declaration in support of a Verified Complaint for forfeiture in rem of the following property:

- **2022 Featherlite Vantare H3-S2 Motor Home (Coach) bearing VIN: 2PCVS3496KC710378 (Defendant Property)**

## FACTS AND CIRCUMSTANCES

7. I am currently conducting an investigation regarding fraudulent Medicare claims for lab testing submitted by four clinical laboratories (hereinafter collectively referred to as "Subject Labs") - Vitas Laboratory LLC (Vitas), Solas Health Technologies PLLC aka Corrlabs LLC (Corrlabs); Nations Laboratory Services LLC (Nations) and Beach Tox LLC (Beach Tox). The investigation also involves fraudulent claims submitted to Blue Cross and Blue Shield (Blue Cross) by medical clinics.

8. Based on the investigation and as set forth below, there is probable cause to believe that from at least as early as 2018 and continuing to the present, Billy Taylor (TAYLOR) and others engaged in a conspiracy and scheme to defraud Medicare by submitting fraudulent Medicare claims for lab tests that were never performed. These fraudulent Medicare claims included claims for lab tests performed after beneficiaries died and for lab tests never ordered by the medical providers or performed for the patients listed on the claims.

9. The general way that the scheme to defraud Medicare worked was that Billy Taylor would establish or acquire control of clinical laboratories through which Billy Taylor and his co-conspirators obtained information about medical providers, patients, and lab tests. This information, which included the names and National Provider Identifiers (NPIs) for medical providers and the names and social security numbers of Medicare beneficiaries, would then be used by Billy Taylor and his co-conspirators to submit fraudulent Medicare claims on behalf of the Subject Labs for lab tests which were not ordered from or performed by the Subject Labs. The Subject Labs would submit fraudulent claims by using information from lab orders submitted to a lab or from lab tests previously performed at a lab acquired by Billy Taylor. The fraudulent claims

included approximately 1.9 million dollars in claims for lab tests purportedly performed for a beneficiary after that beneficiary's death.

10.  From November 1, 2017 to September 5, 2019, Vitas submitted more than $23 million in Medicare claims and was paid approximately $7.8 million on these claims. From May 10, 2019 to February 19, 2021, Corrlabs submitted more than $10 million in Medicare claims and was paid approximately $2.1 million on these claims. From October 3, 2019 to February 16, 2021, Nations submitted more than $24 million in Medicare claims was paid approximately $4.3 million on these claims. From March 9, 2020 to February 17, 2021, Beach Tox submitted more than $56 million in Medicare claims and was paid approximately $17.8 million on these claims. Additional Medicare records show that Beach Tox continued to submit Medicare claims in March and April 2021.

11.  For several months federal law enforcement agencies including the FBI, HHS OIG, and IRS-CI have been investigating fraudulent Medicare claims submitted by the Subject Labs using the following addresses: Vitas at 1311 Fort Street, Suite J, Barling, Arkansas; Corrlabs LLC at 340 Commerce Avenue 10, Southern Pines, North Carolina 28387; Nations at 204 E. Walnut Street, Tecumseh, Oklahoma 74873; and Beach Tox at 4025 Spencer Street, Suite 303, Torrance, California 90503.

12.  Probable cause that the Subject Offenses occurred is based on interviews with medical providers, patients, and others as wells as the review of records relating to the submission of Medicare claims, the payment of these claims, and the disposition of the funds paid on these claims.

A. **Relevant Health Care Regulations and Statutes**

13. Federal law makes it a crime for anyone to knowingly or willfully execute or attempt to execute a scheme or artifice: (1) to defraud any health care benefit program or (2) to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by or under the custody or control of a health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services. 18 U.S.C. § 1347(a).

14. A "health care benefit program" is defined as "any public or private plan to contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b). In this case, the Medicare program that was billed falls under the definition of a "health care benefit program." Medicare is a federal system of health insurance for people over 65 years of age and for certain younger people with disabilities.

15. Under Federal regulations, CLIA (Clinical Laboratory Improvement Amendments) registration and certification by the Centers for Medicare and Medicaid Services ("CMS") is required of all laboratories in the United States before it can accept human samples for diagnostic testing.

16. Federal regulations also permit laboratories to refer test samples to other laboratories in certain circumstances. In such laboratory-to-laboratory referrals, a service is performed by one laboratory at the request of another laboratory. One laboratory (the "referring laboratory") refers a sample to another laboratory for testing. The "reference laboratory" is the laboratory that receives this sample from the referring laboratory, and the reference laboratory

5

performs the test on this sample. The referring laboratory is permitted to bill Medicare for the test performed by the reference laboratory if they meet one of the following conditions: (i) the referring laboratory was located in, or was part of, a rural hospital; (ii) the referring laboratory was wholly owned by the entity performing such test, the referring laboratory wholly owned the entity performing such test, or both the referring laboratory and the entity performing such test were wholly owned by a third party; or (iii) the referring laboratory did not refer more than 30 percent of the clinical laboratory test for which it received requests for testing during the given calendar year. 42 U.S.C. § 1395l(h)(5)(A)(ii).

      **B.**      **The Fraudulent Scheme**

17. On January 25, 2017, Vitas was formed in Delaware by TAYLOR and others. Vitas received CLIA certification on February 28, 2017, with the address 1311 Fort Street, Suite J, Barling Arkansas, and was enrolled to submit claims to Medicare in or around February 2017. Barling, Arkansas, is located within the Western District of Arkansas.

18. Beach Tox was formed in California on June 16, 2016. In June 2017, Beach Tox submitted Medicare enrollment paperwork listing 4025 Spencer St. Unit 303, Torrance, California as the practice location WITNESS 1[1] as the owner and authorization for electronic payments to be made to a J.P. Morgan Chase Bank account ending in 1089 ("Beach Tox Chase Bank account").

19. Beginning January 2017, TAYLOR established Vitas in Barling, Arkansas as a new clinical laboratory. On February 29, 2020, TAYLOR and a co-conspirator acquired ownership and control of Beach Tox. TAYLOR did not acquire ownership of the lab equipment. Further, TAYLOR never submitted any laboratory samples for testing to the owner of the lab equipment.

---

[1] WITNESS 1 is an individual who is known to law enforcement but whose identity is being withheld from this affidavit for the purposes of shielding their identity when this document becomes public pursuant to the Orders of this Court regarding the unsealing of documents.

20. TAYLOR and his accomplices used the Subject Labs to submit false and fraudulent laboratory testing services that were often never provided, and not ordered by the doctors on the claims. TAYLOR and his accomplices used, without authorization, the names and social security numbers for beneficiaries and the names and NPI for medical providers to submit these claims.

21. TAYLOR and his accomplices committed the fraudulent scheme to defraud Medicare through the following three basic steps:

- *First*, TAYLOR and his accomplices established or acquired labs.
- *Second*, the lab would obtain the names and social security numbers for beneficiaries, and the names and National Provider Identifiers ("NPI") for medical providers, either through legitimate lab referrals (Vitas) or pre-acquisition billing records (Beach Tox), and used this information to submit fraudulent claims to Medicare.
- *Third*, TAYLOR hired and trained inexperienced billers to use the provider and beneficiary information to bill Medicare repeatedly for services that were not provided under the names of doctors who never ordered them.

22. TAYLOR and his accomplices had no access to any working laboratory testing equipment at Beach Tox. Nevertheless, after TAYLOR acquired Beach Tox, Beach Tox billed Medicare for over $65 million in claims in a short period of time, including more than $3 million for dates-of-service before TAYLOR and his accomplice owned the lab. No reference labs were identified by Beach Tox in the billing data.

23. Medicare is a federal system of health insurance for people over 65 years of age and for certain younger people with disabilities and is a "health care benefit program" as defined in 18 U.S.C. § 24(b). Medicare records were obtained for claims submitted by Beach Tox, Corrlabs

and Nations with dates of service from January 1, 2017 through February 19, 2021 and for Vitas from January 1, 2017 to August 28, 2020.

24. From November 1, 2017 to May 1, 2020, Vitas submitted more than $23 million in Medicare claims and was paid approximately $7.8 million on these claims. From May 10, 2019 to December 16, 2020, Corrlabs submitted approximately $10 million in Medicare claims and was paid approximately $2.1 million on these claims. From October 3, 2019 to February 16, 2021, Nations submitted approximately $24 million in Medicare claims was paid approximately $4.3 million on these claims. From March 9, 2020 to February 17, 2021, Beach Tox submitted more than $56 million in Medicare claims and was paid approximately $17.8 million on these claims.

### Nations Laboratory Services, LLC

25. In 2018, Nations was formed in Delaware. InNovember 2018, Nations submitted Medicare enrollment paperwork listing 204 E. Walnut St., Tecumseh, Oklahoma as the practice location, ownership interest of 90% by Nations Holdings LLC and 10% ownership by Cenegen LLC (known to be associated with James Taylor[2]), and authorizing electronic payments to be made to a Nations Lab BancFirst account with account number ending 4027 (hereinafter Nations Lab BancFirst account). On October 10, 2019, an enrollment form allowing Nations to submit Medicare claims electronically through the Novitasportal was signed and submitted.

26. On October 11, 2019, James Taylor became the sole authorized person on the Nations Lab BancFirst account. When James Taylor took over the account, it had a negative balance of $321.04 and a check for $350 was deposited from BMH Holdings LLC to create a positive balance. From October 11, 2019 (with the first Medicare payment occurring November 13, 2019) to December 31, 2020, Medicare payments totaling $4,312,151.86 (approximately 87%

---

[2] There is no known relation between James "Jimbo" Taylor and TAYLOR.

of total deposits) were made to the Nations Lab BancFirst account out of total deposits of $4,931,617.45.

27. From December 3, 2019 through December 31, 2020, James Taylor transferred $1,124,500 from the Nations Lab BancFirst account to accounts controlled by Billy Taylor including transfers between December 3, 2019 and March 10, 2020 totaling $841,500 and transfers between October 26, 2020 and December 31, 2020 totaling $283,000. Most of these transfers were in excess of $10,000.

### Fraudulent Medicare Claims Involving Arizona Pain and Spine Institute

28. From March 9, 2020 to February 17, 2021, Corrlabs, Nations and Beach Tox submitted Medicare claims listing the names and NPIs of medical providers associated with Arizona Pain and Spine Institute (hereinafter Arizona Pain) as the referring providers, as follows: Corrlabs approximately $406,000 in claims (paid approximately $15,000); Nations approximately $1.5 million (paid approximately $227,000); and Beach Tox approximately $6.4 million (paid approximately $2 million).

29. In February 2021, Arizona Pain medical providers and billing manager were interviewed, and they confirmed they did not order the lab tests which made up these Medicare claims by the Subject Labs. The Subject Labs used beneficiary and NPI information from prior legitimate lab tests ordered by Arizona Pain and sent to Vitas or Beach Tox and created fraudulent Medicare claims for tests never ordered or performed.

**Fraudulent Medicare Claims Involving FNP S.J.**

30.     From September 17, 2018 to February 17, 2021, Medicare claims listing Family Nurse Practitioner (FNP) S.J.[3] (S.J.)and his/her NPI as the referring providerwere submitted, as follows: Vitas approximately $672,000 in claims (paid approximately $207,000); Corrlabs approximately $497,000 (paid approximately $96,000); Nations approximately $2.9 million (paid approximately $536,000); and Beach Tox approximately $6.1 million (paid approximately $2 million).

31.     On April 6, 2021, law enforcement agents interviewed S.J. and learned s/he had used Vitas in the past for lab testing but had stopped using them in approximately March 2019 and began using another laboratory out of Washington exclusively since that time. S.J. stated s/he never sent samples for lab testing to Corrlabs, Nations, or BeachTox. S.J. stated when Vitas was being used for lab testing, s/he often received lab results performed by other labs.

**Fraudulent Medicare Claims Involving Dr. K.**

32.     From May 4, 2018 to February 16, 2021, Medicare claims listing Dr. K[4] and his NPI as the referring provider were submitted as follows: Vitas approximately $2.4 million in claims (paid approximately $893,000); Corrlabs approximately $596,000 (paid approximately $175,000); Nations approximately $1.3 million (paid approximately $402,000); and Beach Tox approximately $1.4 million (paid approximately $442,000).

---

[3] S.J. is an individual who is known to law enforcement but whose identity is being withheld from this affidavit for the purposes of shielding their identity when this document becomes public pursuant to the Orders of this Court regarding the unsealing of documents.
[4] Dr. K is an individual who is known to law enforcement but whose identity is being withheld from this affidavit for the purposes of shielding their identity when this document becomes public pursuant to the Orders of this Court regarding the unsealing of documents.

33. On March 9, 2021, law enforcement agents interviewed Dr. K. and the billing manager of the medical clinic where s/he worked regarding Medicare claims submitted using his/her name and NPI as the referring medical provider. Dr. K. stated s/he had never ordered or reviewed any lab tests for his patients from Corrlabs, Nations and Beach Tox. Dr. K treated patients at the medical clinic and routinely ordered monthly urine drug tests for patients receiving opioids.

34. The billing manager for Dr. K stated that in 2018, the medical clinic began using Vitas for urine drug testing but began using another lab for urine drug testing in approximately May 2019 because Vitas was not providing lab results in a timely fashion. The billing manager was not familiar with Corrlabs, Nations or Beach Tox and stated that the medical clinic never submitted samples to these labs for testing.

**Fraudulent Medicare Claims Involving Dr. B.**

35. From March 20, 2019 to February 16, 2021, the Subject Labs submitted Medicare claims listing Dr. B[5] and her NPI as the referring provider as follows: Vitas approximately $1.5 million in claims (paid approximately $563,000); Corrlabs approximately $1 million (paid approximately $352,000); Nations approximately $702,000 (paid approximately $219,000); and Beach Tox approximately $1 million (paid approximately $363,000).

36. On July 27, 2020, law enforcement agents interviewed Dr. B who stated s/he began working one day a week at Community Family Medical Clinic (hereinafter Community Family) before it was sold to TAYLOR and others. The previous owner of Community Family told law enforcement agents the clinic was opened in approximately 2018 and sold to TAYLOR and others on March 15, 2019 and did not use Vitas for lab tests when he owned the clinic. After the change

---

[5] Dr. B is an individual who is known to law enforcement but whose identity is being withheld from this affidavit for the purposes of shielding their identity when this document becomes public pursuant to the Orders of this Court regarding the unsealing of documents.

in ownership, Dr. B agreed to continue seeing patients. Dr. B saw no patients at Community Family on or after September 19, 2019.

37. Community Family used Vitas for lab testing during the time it was owned by TAYLOR. Dr. B was asked if s/he had heard of these labs and stated these did not ring a bell. When told there were Medicare claims listing him/her as the referring provider for Beach Tox, Nations or Corrlabs in 2020, s/he stated that s/he did not refer or order the labs related to these claims. S/he explained that, in 2020, s/he practiced at a clinic in Tulsa and had no need to order toxicology tests in that practice. S/he stated s/he had not ordered a urine drug screen in a long time and, if s/he did order one, s/he would have sent it to a different laboratory.

**Transfers and Purchases Involving the Beach Tox Bank of Oklahoma Account**

38. From February 9, 2021 to February 12, 2021 (with the first Medicare payment occurring February 9, 2021), Medicare payments totaling $4,238,910.74 were deposited into the Beach Tox Bank of Oklahoma account including a transfer of $3,990,490.32 on February 9, 2021. This account was controlled by Brant Jolly and TAYLOR.

**Transfer to Featherlite Coach**

39. On February 9, 2021, TAYLOR sent an outgoing fed wire for $1.3 million from the Beach Tox Bank of Oklahoma account, which had received the proceeds of the fraudulent conduct alleged herein, to Coach LLC d/b/a Featherlite Coaches as payment on the purchase on the Defendant Property. James Taylor arranged for this purchase and traded in a vehicle valued at approximately $675,000 to make up the total purchase price of approximately $2 million. The Defendant Property was subsequently registered in the name of CelestaTaylor, the wife of James Taylor and then ultimately in the name of Maehunt Farms, LLC, which is owned by James Taylor.

40.     Throughout the course of this investigation, investigators have discovered TAYLOR and his co-conspirators submitted false and fraudulent bills on behalf of multiple "referring providers" (medical provider who is responsible for ordering a laboratory test). Investigators have interviewed these providers individually. Through these interviews, investigators discovered none of the referring providers ordered the tests billed by TAYLOR controlled laboratories. Based on these interviews, I believe TAYLOR and his co-conspirators engaged in a large-scale healthcare fraud wherein they fraudulently processed and submitted millions of dollars of claims and attributed these lab tests to orders from the listed referring providers and others for which no services were rendered.

41.     From February 9, 2021 to February 12, 2021, Medicare payments totaling approximately $4.2 million were made to the Beach Tox Bank of Oklahoma account. As set forth above, there is probable cause to believe that these payments were proceeds of unlawful activity to include Health Care Fraud and conspiracy to commit Health Care Fraud, defined as specified unlawful activities for purposes of Money Laundering. Records were obtained and other investigation conducted regarding financial transactions conducted with money from or traceable to these accounts. As set forth below, there is probable cause to believe that TAYLOR and others transferred Medicare money from these accounts and/or traceable to these accounts to other bank accounts and to purchase assets and otherwise conduct financial transactions in excess of $10,000 in violation 18 U.S.C. § 1957.

## Property to Be Forfeited

1.     Through my investigation, I know the Defendant Property is registered in the name of Maehunt Farm, LLC. Through my investigation I know Maehunt Farm, LLC to be owned by James Taylor and Celesta Taylor.

2. Based on a review of bank records obtained through this investigation, it is known: For the period of February 9, 2021 to February 12, 2021, Medicare funds totaling $4,238,910.74 were deposited into the Beach Tox Bank of Oklahoma account including a transfer of $3,990,490.32 on February 9, 2021.

3. On February 9, 2021, Billy Taylor sent an outgoing fed wire for $1.3 million from the Beach Tox Bank of Oklahoma account to Coach LLC dba Featherlite Coaches as payment on the purchase of the Defendant Property. James Taylor arranged for this purchase and traded in a vehicle valued at approximately $675,000 to make up the total purchase price of approximately $2 million. The Defendant Property was subsequently registered in the name of Celesta Taylor, the wife of James Taylor, and then ultimately in the name of Maehunt Farm, LLC, owned by James Taylor.

4. Based on my investigation, I believe this transaction constitutes a violation of Money Laundering as it represents a financial transaction in excess of $10,000 in violation 18 U.S.C. § 1957 and was funded by the specified unlawful activity as detailed herein.

## CONCLUSION

5. Based on these facts and circumstances stated herein, Affiant and the FBI, Little Rock Field Office believe there is probable cause to forfeit the property described as:

- **2022 Featherlite Vantare H3-S2 Motor Home (Coach) bearing VIN: 2PCVS3496KC710378**

as proceeds of the following offenses: Title 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud) and Title 18 § U.S.C. 1957 (Money Laundering).

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief, pursuant Title 28, United States Code, Section 1746.

In Fort Smith, Arkansas, this 4TH day of October, 2021.

Matthew K. Ferguson
Special Agent
Federal Bureau of Investigation